UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CHARLES D. WARREN,

                   Plaintiff,

          - against -

CITY OF NEW YORK DEPARTMENT OF
CORRECTIONAL MEDICAL STAFF, CITY
OF NEW YORK FDNY EMT EMERGENCY
AMBULANCE PERSONNEL, and ASLAM
KADRI, M.D.,

                 Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
17-CV-1125 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Charles D. Warren, proceeding *pro se*, filed this action for damages under 42 U.S.C. § 1983, alleging that he received constitutionally inadequate medical treatment for an asthma attack while in custody as a pretrial detainee at the Anna M. Kross Center on Rikers Island ("Rikers") in 2014.[1]  Plaintiff brought claims against the City of New York Department of Correctional Medical Staff and the City of New York FDNY EMT Emergency Ambulance Personnel, which are effectively claims against the City of New York ("the City"),[2] as well as a claim of deliberate indifference against Aslam Kadri, M.D., the medical doctor at Rikers who provided Plaintiff with allegedly constitutionally inadequate medical treatment.  Presently before the Court is Defendants' motion for summary judgment under Federal Rule of Civil Procedure

---

[1]  Plaintiff is currently incarcerated at the Five Points Correctional Facility in Romulus, New York.

[2]  *See* N.Y. City Charter, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.").

("FRCP") 56 or, in the alternative, judgment on the pleadings under FRCP 12(c). For the following reasons, the motion is granted with respect to the claims against the City but denied with respect to the claim against Dr. Kadri. This Memorandum and Order also addresses Plaintiff's request for sanctions because of alleged spoliation of evidence. That request is denied in its entirety.

## BACKGROUND

### I.    Factual Background[3]

Plaintiff has long suffered from asthma, which he has had since birth. (*See* Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 146, ¶ 13; Deposition of Charles D. Warren ("Warren Dep."), Dkt. 145-7, at 28:10–16.) Due to the severity of his asthma as a child, he was hospitalized and intubated approximately ten times by the time he was in the Fourth Grade. (Warren Dep., Dkt. 145-7, at 31:3–16; *see also* Defs.' 56.1, Dkt. 146, ¶ 13.) Plaintiff's condition improved as he grew older, but even so, in the years leading up to his incarceration at Rikers, he had to visit the emergency room on a number of occasions because of his asthma. (*See* Warren Dep., Dkt. 145-7, at 35:24–36:20, 39:19–43:13; *see also* Defs.' 56.1, Dkt. 146, ¶ 13; Plaintiff's Opposition to Summary Judgment ("Pl.'s Opp."), Dkt. 138, ¶ 13 at ECF[4] 38–39.) Plaintiff was also prescribed

---

[3]   Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. Plaintiff here, instead of filing a separate 56.1 statement, submitted an opposition that tracks Defendants' 56.1 statement by paragraph number but combines both arguments and factual allegations. (*See generally* Plaintiff's Opposition to Summary Judgment ("Pl.'s Opp."), Dkt. 138.) "In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a [separate] Local Rule 56.1 Statement and conducts its own independent review of the record," and "the Court will rely principally on its own assiduous review of the record." *Liverpool v. Davis*, 442 F. Supp. 3d 714, 723 (S.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 416 n.1 (S.D.N.Y. 2012)).

[4]   Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

several medications: Advair, a steroid inhaler to prevent asthma symptoms; Albuterol, a rescue inhaler; and Singular, for allergies.  (Warren Dep., Dkt. 145-7, at 37:1–38:23.)

Upon admission to Rikers on May 9, 2011, Plaintiff underwent a medical evaluation, and his history of asthma was documented.  (Defs.' 56.1, Dkt. 146, ¶ 14; *see also* Correctional Health Services Medical Records ("CHS Records"), Dkt. 145-8, at ECF 9.)  During this initial evaluation, Plaintiff exhibited a "[m]oderate[l]y congested nose" as well as "inspiratory wheezing" and "expiratory wheezing," but he had "normal air movement" in his lungs and "no respiratory distress."  (CHS Records, Dkt. 145-8, at ECF 10–11.)  Plaintiff's "peak flow," a measurement of how well the lungs can expel air, was 440 at the time.  (*Id.* at ECF 10; *see also* Defs.' 56.1, Dkt. 146, ¶ 14; Pl.'s Opp., Dkt. 138, ¶ 14 at ECF 39.)  According to the medical records, Plaintiff's "best peak flow" is in the range of "451–500."[5]  (CHS Records, Dkt. 145-8, at ECF 37.)  The medical records also show that Plaintiff was prescribed and started on medications, including Advair, Albuterol, and Singular, following his arrival at Rikers.  (*See id.* at ECF 12, 21.)

Nonetheless, Plaintiff continued to suffer asthma attacks, or exacerbations,[6] while at Rikers, including one incident in June 2011 that required transfer to Elmhurst Hospital Center ("Elmhurst Hospital"), and subsequently Bellevue Hospital Center ("Bellevue Hospital"), for

---

[5] "A 'normal' peak flow rate is based on a person's age, height, sex and race.  A standardized 'normal' may be obtained from a chart comparing the person with asthma to a population without breathing problems." *Measuring Your Peak Flow Rate*, American Lung Association, https://www.lung.org/lung-health-diseases/lung-disease-lookup/asthma/living-with-asthma/managing-asthma/measuring-your-peak-flow-rate (last visited Mar. 25, 2021); *see also Peak Flow Test*, British Lung Foundation, https://www.blf.org.uk/support-for-you/breathing-tests/peak-flow (last visited Mar. 25, 2021) (chart showing "Peak Expiratory Flows – normal values, EU scale" based on age, gender, and height).

[6] The terms "asthma attack" and "asthma exacerbation" are used synonymously throughout the record.  (*See, e.g.*, Expert Report of John O'Grady, M.D. ("O'Grady Report"), Dkt. 145-5, at 5.)  The Court understands an asthma attack, or exacerbation, to mean a worsening of asthma symptoms.

further treatment.  (Pl.'s Opp., Dkt. 138, ¶ 15 at ECF 41; *see also* CHS Records, Dkt. 145-8, at ECF 28; Elmhurst Medical Records ("Elmhurst Records"), Dkt. 145-14, at ECF 2; Bellevue Medical Records ("Bellevue Records"), Dkt. 145-15, at ECF 3.)  On March 1, 2014, several weeks before the events at issue in this case, Plaintiff experienced another asthma attack and saw defendant Dr. Kadri for the first time, when Plaintiff presented to the medical clinic at Rikers complaining of "difficulty breathing" and "tightness in the chest."  (*See* Pl.'s Opp., Dkt. 138, ¶ 16 at ECF 41; CHS Records, Dkt. 145-9, at ECF 257.)  Plaintiff's peak flow measured only 200.  (CHS Records, Dkt. 145-9, at ECF 257.)  After Dr. Kadri administered Albuterol, Plaintiff "reported feeling some relief" and his peak flow improved to 250.  (*Id.*)  Plaintiff was also prescribed Advair and Amoxicillin, and he saw Dr. Kadri the next evening for a "follow up."  (*Id.* at ECF 257, 259; *see also* Pl.'s Opp., Dkt. 138, ¶ 16 at ECF 42.)

This case centers around the events of April 27, 2014, which the parties dispute.  According to Plaintiff, at some point in the afternoon on April 27, 2014, he began experiencing an asthma attack and was brought to the medical clinic at Rikers, where he complained of a cough, wheezing, and shortness of breath.  (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 42; *see also* Warren Dep., Dkt. 145-7, at 88:6–90:5.)  At around 4:16 p.m.,[7] he was seen by Dr. Kadri, who measured Plaintiff's peak flow to be a mere 150.  (*See* Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 42; CHS Records, Dkt. 145-9, at ECF 324.)  Dr. Kadri administered Albuterol and Prednisone[8] to Plaintiff, prescribed the antibiotic

---

[7]  It is not entirely clear what time Plaintiff was seen by Dr. Kadri on April 27, 2014.  Although Plaintiff seems to admit, and the medical records indicate, that Plaintiff's peak flow was measured by Dr. Kadri at 4:16 p.m. (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 42; CHS Records, Dkt. 145-9, at ECF 324), Plaintiff's deposition testimony indicates that he arrived at the clinic around noon (Warren Dep., Dkt. 145-7, at 90:2–91:3).

[8]  Prednisone is a corticosteroid drug that suppresses inflammation.  *See Prednisone and Other Corticosteroids*, Mayo Clinic, https://www.mayoclinic.org/steroids/art-20045692 (last visited Mar. 25, 2021).

Zithromax, and sent Plaintiff on his way.  (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 42–43.)  Plaintiff

returned to the front desk of the clinic some time later and informed one of the correctional officers,

Officer Ingrid Garcia, that he felt like he was "going to die."  (*Id.* at ECF 43; *see also id.* ¶ 3 at

ECF 7, 11–12.)  According to Plaintiff, Officer Garcia relayed this information to Dr. Kadri, but

Dr. Kadri—in the presence of Plaintiff, Officer Garcia, and another correctional officer, Officer

Hanson[9]—refused to provide Plaintiff any further medical attention.  (*Id.* ¶ 3 at ECF 11–12, ¶ 17

at ECF 43; *see also* Warren Dep., Dkt. 145-7, at 99:12–16 (testifying that Dr. Kadri told Plaintiff,

"I already saw you, I'm not seeing you again, go back to your house").)  Plaintiff was then placed

in a "holding cell" in the clinic and "left to slowly exacerbate[] for ten hours."  (Pl.'s Opp., Dkt.

138, ¶ 17 at ECF 43 (internal quotation marks omitted).)  Plaintiff recalls repeatedly banging on

the door and window of the holding cell and saying he needed help, but Officer Garcia told him

that there was nothing that she could do.  (Warren Dep., Dkt. 145-7, at 103:2–10.)  At some point

during this period, Plaintiff did some pushups in an attempt "to open his lungs."[10]  (Pl.'s Opp.,

---

[9]  Officer Hanson's first name is not clear from the record.  Plaintiff identifies Officer Hanson by "Badge No. 13102."  (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 43.)  Logbook entries attached to an affidavit submitted by Officer Garcia indicates that Officer Hanson was stationed at the "Admin" post in the clinic between 3:00 p.m. and 11:00 p.m. on April 27, 2014.  (Dkt. 145-16, at ECF 8.)  Timesheets attached to Plaintiff's opposition identifies a "Hanson, Lorna," who punched in at 11:54 p.m. on April 27, 2014, and punched out at 8:08 a.m. on April 28, 2014.  (Pl.'s Opp., Dkt. 138, at ECF 110–11; *see also* Dkt. 91-3, at ECF 2–3.)

[10]  Although Plaintiff presently admits to performing pushups while he was "exacerbating" in the holding cell (Pl.'s Opp., Dkt. 138, ¶ 18 at ECF 46), a fact highlighted by Defendants and their expert (*see* Defs.' 56.1, Dkt. 146, ¶ 18; O'Grady Report, Dkt. 145-5, at 6), the apparent source of this fact, Plaintiff's deposition testimony, paints a murkier picture.  (*See* Warren Dep., Dkt. 145-7, at 103:11–16 ("I was still sitting in the pen and I was still feeling bad.  I tried to drink water.  I kept hearing a voice tell me to do push-ups.  I kept responding to the voice I can't do push-ups, it's not going to help."), 104:9–15 ("I kept hearing a voice saying to do push-ups, you're suffering from a flu.  No, it's just a cold, do push-ups.  They say when you work out[,] you sweat the cold out.  I said that's not going to help.  My chest is tight.  I was talking to myself out loud to the person.").)

Dkt. 138, ¶ 18 at ECF 46.)  Eventually, at around 1:10 a.m. on April 28, 2014, a new doctor, Edouard Guillaume, arrived at the clinic, and Plaintiff finally received medical attention.  (*See id.* ¶ 17 at ECF 45–46; *see also* Warren Dep., Dkt. 145-7, at 104:16–105:16; CHS Records, Dkt. 145-9, at ECF 327–30.)

Defendants' version of the events on April 27, 2014 tells a much different story.  According to Defendants, after initially seeing Plaintiff at around 4:16 p.m. and starting him on a course of Zithromax, Prednisone, and Albuterol, Dr. Kadri "continued to monitor" Plaintiff.  (Defs.' 56.1, Dkt. 146, ¶ 17.)  At 8:41 p.m., Dr. Kadri documented that Plaintiff's peak flow had improved from 150 to 325, and accordingly "directed [Plaintiff] to continue on the same treatment" and to follow up at the clinic the next day.  (*Id.*; *see also* CHS Records, Dkt. 145-9, at ECF 324.)  Plaintiff's condition, however, worsened, and several hours later, at around 1:10 a.m. on April 28, 2014, Plaintiff returned to the clinic complaining of "chest tightness, non-productive cough and shortness of breath."  (Defs.' 56.1, Dkt. 146, ¶ 19; *see also* CHS Records, Dkt. 145-9, at ECF 328.)  Dr. Kadri's shift had ended at 12:24 a.m., so Plaintiff was seen by and received treatment from Dr. Guillaume at approximately 1:10 a.m.  (*See* Defs.' 56.1, Dkt. 146, ¶¶ 17–19.)  Dr. Guillaume's shift had started several hours earlier at 8:01 p.m. on April 27 (*see* Dkt. 145-13, at ECF 2–3), *i.e.*, not at around 1:00 a.m. on April 28 as Plaintiff avers (*see, e.g.*, Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 46).

In addition to the time Dr. Guillaume started his shift on the evening of April 27, 2014, Defendants point out other discrepancies between the record evidence and Plaintiff's account of the events.  Notably, Defendants submit an affidavit by Officer Garcia, who remembers Plaintiff as an inmate at Rikers but does not recall any conversations with Plaintiff on April 27, 2014. (Affidavit of Ingrid Garcia ("Garcia Aff."), Dkt. 145-16, ¶ 2.)  In fact, based on her review of

certain logbooks, Officer Garcia affirms that she was not on duty, or even at Rikers, between 3:00 p.m. and 11:00 p.m. on April 27, 2014,[11] although she was on duty both before and after that shift.  (*Id.* ¶¶ 4, 6 (stating that she was at the "x-ray post" in the clinic between 7:30 a.m. and 3:00 p.m. on April 27, and at the clinic front desk "A post" from 11:00 p.m. on April 27 to 7:30 a.m. on April 28).)  Defendants also point out that when Dr. Guillaume saw Plaintiff in the early morning hours of April 28, 2014, the doctor noted that Plaintiff had been "evaluated for simila[r] symptoms" the previous afternoon and that Plaintiff's peak flow had improved from 125 to 325 after being treated with Albuterol and Prednisone.[12]  (Defs.' 56.1, Dkt. 146, ¶ 19; *see also* CHS Records, Dkt. 145-9, at ECF 328.)    For his part, Plaintiff points to records from the "eClinicalWorks - Clinical Visit Console" suggesting that Dr. Kadri did not see—and indeed, could not have seen—Plaintiff at 8:41 p.m. on April 27, *i.e.*, the time at which Dr. Kadri supposedly noted that Plaintiff's peak flow had improved to 325.  (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 43–44.)  These records indicate that Dr. Kadri saw Plaintiff for asthma-related reasons at 4:15 p.m. on April 27, 2014, but that Dr. Kadri did not see Plaintiff again on that day.  (*See* Pl.'s Opp., Dkt. 138, at ECF 144.)  Rather, at 8:27 p.m. on April 27, Dr. Kadri was dealing with an emergency with another patient from a different housing area, and then at 8:48 p.m., Dr. Kadri was

---

[11]  The logbook entries attached to Officer Garcia's affidavit show that Officer Hanson worked the "Admin" post at the clinic between 3:00 p.m. and 11:00 p.m. on April 27, 2014.  (Dkt. 145-16, at ECF 8.)

[12]  There is no explanation for the discrepancy between the peak flow of 150 documented by Dr. Kadri at around 4:16 p.m. on April 27 and the 125 noted by Dr. Guillaume.  (*Compare* CHS Records, Dkt. 145-9, at ECF 324, *with id.* at ECF 328.)  The medical records include a "late entry" by Win Mouk, R.N., signed at 4:25 a.m. on April 28, 2014, reiterating that Plaintiff "was seen by medical provider [on the] previous tour" and that Plaintiff's peak flow had improved from 125 to 325.  (*Id.* at ECF 330–31.)  The time stamp on both of these values is "04/28/2014 [-] 04:19:18 AM."  (*Id.* at ECF 330.)  It is undisputed that Plaintiff departed the clinic by ambulance at approximately 2:26 a.m. on April 28.  (*See id.*; *see also* Defs.' 56.1, Dkt. 146, ¶ 20.)

treating a different patient who had an injury.  (*See id.*)  In short, Plaintiff avers that the 8:41 p.m. entry showing an improvement in his peak flow to 325 was falsified.  (*See* Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 43, ¶ 19 at ECF 52.)

When Dr. Guillaume examined Plaintiff at around 1:10 a.m. on April 28, he observed that Plaintiff's lungs exhibited "expiratory high pitched wheezes and prolonged expiratory phase[s]," and that Plaintiff's peak flow measured 150.  (CHS Records, Dkt. 145-9, at ECF 328.)  Dr. Guillaume administered Albuterol to Plaintiff, but Plaintiff's peak flow remained at 150.  (*Id.*)  Thereafter, Plaintiff was given an oxygen mask, and emergency medical services ("EMS") were called at 1:48 a.m. to transport Plaintiff to the hospital.  (*Id.* at 328–29; *see also* Defs.' 56.1, Dkt. 146, ¶ 20.)  Although Plaintiff appeared to be in stable condition when he left the clinic (*see* Defs.' 56.1, Dkt. 146, ¶ 20; CHS Records, Dkt. 145-9, at ECF 330), his condition deteriorated during the trip to the hospital, and the paramedics had to stop the vehicle to administer epinephrine and dexamethasone to Plaintiff (Pl.'s Opp., Dkt. 138, at ECF 260).

Plaintiff arrived at Elmhurst Hospital at approximately 3:07 a.m. and was admitted to the emergency department at around 3:24 a.m.  (*See id.* at ECF 258; Elmhurst Records, Dkt. 145-14, at ECF 31.)  The admitting physician observed that Plaintiff was pale, "diaphoretic" (*i.e.*, sweating profusely), and "tachypnic" (*i.e.*, breathing rapidly), and that he still exhibited "expiratory wheezing."  (Elmhurst Records, Dkt. 145-14, at ECF 31.)  Plaintiff was also anxious, but alert and oriented.  (*Id.*)  Plaintiff was placed on a BiPAP, a machine that provides "bilevel noninvasive ventilation."  (*Id.* at ECF 48; *see also* Bellevue Records, Dkt. 145-15, at ECF 351 (noting that Plaintiff was admitted to the Intensive Care Unit at Elmhurst and required "bilevel noninvasive ventilation").)

After a day in the Intensive Care Unit at Elmhurst Hospital, during which Plaintiff's peak flow remained between 150 and 200, Plaintiff was transferred to Bellevue Hospital in the early morning hours of April 29, 2014 for further monitoring.  (*See* Elmhurst Records, Dkt. 145-14, at ECF 83, 92; *see also* Bellevue Records, Dkt. 145-15, at ECF 206.)  The medical records indicate that Plaintiff presented at Bellevue Hospital "with asthma exacerbation likely precipitated by [a] viral URI [*i.e.*, upper respiratory infection]."  (Bellevue Records, Dkt. 145-15, at ECF 215; *see also* Defs.' 56.1, Dkt. 146, ¶ 22.)  Later on April 29, at around 5:18 p.m., Plaintiff was examined by the attending physician at Bellevue Hospital, who noted that Plaintiff had experienced a "near fatal exacerbation" and that, although he was "gradually improving" and had a peak flow of 400, he was still "moving air poorly."  (Bellevue Records, Dkt. 145-15, at ECF 243.)  Plaintiff was scheduled to be discharged from Bellevue Hospital on May 2 (*see id.* at ECF 351), but the attending physician decided to keep Plaintiff at the hospital for a few extra days "to help get his lung function better and make him lower risk in general population at Rikers" (*id.* at ECF 388).  All in all, Plaintiff remained at Bellevue Hospital for almost a week, and was discharged on May 5, 2014 in stable condition.  (*See* Defs.' 56.1, Dkt. 146, ¶ 22; *see also* Bellevue Records, Dkt. 145-15, at ECF 451–55.)  Nonetheless, prior to Plaintiff's discharge, a physician at Bellevue Hospital contacted the associate medical director at Rikers and instructed this person that Plaintiff was "to have close peak flow monito[r]ing and medication monitoring at Rikers given near fatal asthma."  (Bellevue Records, Dkt. 145-15, at ECF 352.)

## II.    Expert Report

Defendants submit the expert report of John O'Grady, M.D., a doctor of internal medicine, the Director of Medical School Education in the Department of Medicine at Lenox Hill Hospital, and an Adjunct Professor of Medicine at New York Medical College.  (O'Grady Report, Dkt. 145-5, at 1.)  Dr. O'Grady opines that with respect to the events of April 27, 2014, "no act or omission

on the part of [Dr. Kadri] was a departure from the standard of care" in New York, and that "the care rendered by Dr. Kadri did not cause [P]laintiff's alleged injuries." (*Id.* at 4–5.) In particular, it is Dr. O'Grady's opinion that, "based on [Plaintiff's] history of asthma, his complaints [on April 27, 2014], and the peak flow of 150, Dr. Kadri appropriately administered Albuterol Sulfate nebulization solution and Prednisone," and "Dr. Kadri also prescribed Zithromax 250mg in the event that [Plaintiff]'s asthma exacerbation was due to a respiratory infection." (*Id.* at 6.) Relying on the medical records, Dr. O'Grady finds that Plaintiff "was appropriately monitored for several hours," and given that Plaintiff's peak flow reading of 325 at 8:41 p.m. "was well above the peak flow that would require admission to the hospital . . . , it was appropriate to discharge [Plaintiff] and advise him to return the following day." (*Id.*) Dr. O'Grady concludes "to a reasonable degree of medical certainty that Dr. Kadri treated [Plaintiff] appropriately throughout this presentation by monitoring [Plaintiff], administering a bronchodilator [*i.e.*, Albuterol] and Prednisone, and discharging [Plaintiff] after his condition improved for reevaluation the following date." (*Id.*)

Dr. O'Grady further notes that Plaintiff "did not suffer any permanent injury from the asthma exacerbation he suffered in April 2014" and "did not require any intubation either at Elmhurst Hospital or at Bellevue Hospital." (*Id.*) Considering Plaintiff's long history of asthma requiring multiple hospitalizations, Dr. O'Grady opines that "despite the physicians' best efforts, a patient like [Plaintiff] who suffers from severe asthma will routinely require hospitalizations for close monitoring and treatment," and he concludes that "the treatment of [Plaintiff] at Rikers Island did not cause any of the alleged injuries he claims." (*Id.* at 6–7.)

Plaintiff, who is *pro se*, has not produced his own expert. Nevertheless, he points to certain medical records and argues that they show he has "suffered long time damage of volume loss [within] the a[l]veoli" of his lungs. (Pl.'s Opp., Dkt. 138, at ECF 81–82.) Plaintiff specifically

10

draws attention to a pulmonary evaluation that was performed while he was at Bellevue Hospital on May 2, 2014 (*see id.* at ECF 82, 86), which appears to show some reduced lung volume[13] as well as "[d]iffusion [c]apacity: [d]ecreased at 66% predicted" (Bellevue Records, Dkt. 145-15, at ECF 487–88). Plaintiff also generally alleges he experienced pain and suffering and worsening of his asthma attack as a result of being left to "exacerbate" for hours in a holding cell without medical attention. (*See, e.g.*, Pl.'s Opp., Dkt. 138, ¶ 9 at ECF 24–25, ¶ 17 at ECF 45–46, ¶ 20 at ECF 84–85.)

## III.   Procedural History

Plaintiff commenced this action on February 22, 2017, by filing a *pro se* complaint against Defendants, as well as unnamed ambulance technicians and two doctors at Bellevue Hospital. (Dkt. 1.) On May 19, 2017, upon initial screening of the Complaint, the Court *sua sponte* dismissed the claims against the ambulance technicians and Bellevue Hospital doctors pursuant to 28 U.S.C. § 1915(e)(2)(B), but granted Plaintiff leave to amend. (Dkt. 9, at 4.) Plaintiff filed an amended complaint on July 27, 2017. (Dkt. 16.) The Amended Complaint asserts claims that Defendants denied Plaintiff adequate medical attention during his April 2014 asthma attack and failed to train staff properly, and that the unnamed ambulance technicians violated Plaintiff's constitutional rights by giving him an injection of the steroid Solumedrol to which he had an allergic reaction. (*Id.* ¶¶ 43–54.) At a pre-motion conference on November 3, 2017, however, the Court allowed Plaintiff to supplement his allegations with oral statements to state a proper claim of deliberate indifference to serious medical need. (*See* 11/3/2017 Minute Entry; *see also*

---

[13]   The May 2, 2014 evaluation on its face states that, in terms of lung volume, Plaintiff showed "[r]educed FRC/ERV/RV," but "[v]ital and inspiratory capacities [were] within normal limits." (*See* Bellevue Records, Dkt. 145-15, at ECF 487.) "FRC" stands for functional residual capacity; "ERV" stands for expiratory reserve volume; and "RV" stands for residual volume. (*See id.* at ECF 488.)

Transcript of November 3, 2017 Proceedings ("11/3/17 Tr."), Dkt. 39, at 3:5–12:7.)  Additionally, Plaintiff clarified that he was not alleging any claim of deliberate indifference or negligence against the individual ambulance technicians, but rather alleging that his allergic reaction to the injection of Solumedrol was a consequence of Defendants' alleged deliberate indifference.[14]  (*Id.* at 13:15–15:25.)  Finally, Plaintiff withdrew his failure-to-train claim.  (*Id.* at 17:2–20.)

Following the November 3, 2017 conference, Defendants answered the Amended Complaint, and this case proceeded to discovery.  (*See* Dkts. 46, 47.)  At a conference on February 6, 2018, the Honorable Lois Bloom, Magistrate Judge, bifurcated discovery and stayed discovery with respect to any *Monell* claim against the City so that discovery would be focused on the deliberate indifference claim against Dr. Kadri.  (Transcript of February 6, 2018 Proceedings ("2/6/18 Tr."), Dkt. 57, at 19:8–17.)  On April 26, 2018, Judge Bloom granted Plaintiff pro bono counsel "for the limited purpose of conducting discovery."  (Dkt. 63.)  On January 17, 2019, the parties submitted a letter informing Judge Bloom that they had reached a settlement in principle, and on February 1, 2019, Judge Bloom granted leave for Plaintiff's pro bono counsel to withdraw. (Dkts. 77, 80.)  Subsequently, the parties were unable to finalize their settlement agreement, and discovery resumed.  (Dkt. 97.)  Plaintiff was deposed on June 21, 2019, and Defendants served Dr. O'Grady's expert report on September 4, 2019.  (Dkts. 105, 120.)

On November 1, 2019, Defendants requested a pre-motion conference regarding an anticipated dispositive motion.  (Dkt. 128.)  The Court granted the request on November 22, 2019, and held a pre-motion conference on January 17, 2020.  (*See* 11/22/2019 Docket Order; 1/17/2020

---

[14]  The Court notes that, based on the medical records submitted, it appears that Plaintiff was not given Solumedrol by the ambulance technicians during his trip to Elmhurst Hospital; rather, a doctor at Elmhurst Hospital apparently ordered that Solumedrol be administered to Plaintiff.  (*See* Elmhurst Records, Dkt. 145-14, at ECF 31, 64.)

Minute Entry.)  At the pre-motion conference, the Court allowed Defendants to proceed with their anticipated motion and set a briefing schedule.  (Transcript of January 17, 2020 Proceedings ("1/17/20 Tr."), Dkt. 133, at 23:24–24:18, 39:22–40:8, 48:8–18.)  The Court also reiterated that Plaintiff had withdrawn any claim premised on a failure to train at the November 3, 2017 conference, and accordingly, Plaintiff could not re-introduce a failure-to-train claim at such a late juncture and upon which no discovery had been taken.  (*Id.* at 45:1–16, 47:7–48:7.)  Furthermore, the Court discussed with the parties a request by Plaintiff regarding alleged spoliation of certain logbooks that Defendants failed to produce in the course of discovery, and the Court indicated that it would resolve the issue based on the materials already in the record, without the need for additional briefing.  (*Id.* at 26:20–39:3, 48:19–49:17.)

Following the January 17, 2020 conference, Defendants served Plaintiff their motion papers on February 28, 2020.  (Letter of Service, Dkt. 135.)  Plaintiff submitted an opposition, filed on May 19, 2020 (Pl.'s Opp., Dkt. 138), and Defendants replied on July 9, 2020 (Defendant's Reply ("Defs.' Reply"), Dkt. 150).  Defendants ask that the Court grant summary judgment under FRCP 56 with respect to all claims against them or, in the alternative, grant judgment on the pleadings under FRCP 12(c) with respect to the claims against the City.  (*See* Notice of Motion ("Mot."), Dkt. 144; *see also* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), Dkt. 149, at 3.)

## DISCUSSION

## I.   Legal Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law").  A dispute of fact is "genuine" if the record evidence "is such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson*, 477 U.S. at 248.  Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* (citation omitted).  In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247–48 (emphases in original).

The moving party bears the initial burden of "establishing the absence of any genuine issue of material fact."  *Zalaski v. Cty. of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Once this initial burden is met, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (internal quotation marks and citation omitted).

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).  In other words, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."  *Anderson*, 477 U.S. at 255.  The Court does "not weigh evidence or assess

the credibility of witnesses," which "are matters for the jury." *Jeffreys*, 426 F.3d at 553–54 (internal quotation marks and citations omitted); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.").

While a motion for summary judgment focuses on the evidence in the record and whether it creates a genuine issue for trial, a motion for judgment on the pleadings under FRCP 12(c) focuses on the pleadings, particularly the plaintiff's complaint: "Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law." *B. Braxton/Obed-Edom v. City of New York*, 368 F. Supp. 3d 729, 736 (S.D.N.Y. 2019) (quoting *Burns Int'l Sec. Sevs., Inc. v. Int'l Union, United Plant Guard Workers*, 47 F.3d 14, 16 (2d Cir. 1995)). This standard calls for application of "the same standard applicable to dismissals pursuant to [FRCP] 12(b)(6)." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (citation omitted). Accordingly, the Court "accept[s] all factual allegations in the complaint as true[,] draw[s] all reasonable inferences in [the nonmoving party's] favor," and asks whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Johnson v. Rowley*, 569 F.3d 40, 43–44 (2d Cir. 2009) (per curiam) (internal quotation marks and citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Finally, when considering a dispositive motion made by or against a *pro se* litigant, the Court is mindful that a *pro se* party's pleadings must be "liberally construed" in favor of that party and "are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

The Second Circuit "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks and citations omitted).  Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

## II.    Deliberate Indifference Claim Against Dr. Kadri

Defendants move for summary judgment on Plaintiff's claim that Dr. Kadri was deliberately indifferent to Plaintiff's serious medical need.  (*See generally* Defs.' Mem., Dkt. 149, at 5–11.)  Because the events at issue occurred while Plaintiff was a pretrial detainee at Rikers, his deliberate indifference claim is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  "[P]retrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise," and their rights under the Due Process Clause of the Fourteenth Amendment "are at least as great as" those of convicted prisoners under the Eighth Amendment.  *Id.* (internal quotation marks and citations omitted).

Establishing a claim of deliberate indifference to serious medical need under the Due Process Clause requires satisfying a two-prong test.  The first prong, the "objective" prong, examines whether "the alleged deprivation of adequate medical care [was] 'sufficiently serious.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).  The second prong, the "mental element" prong,

16

considers whether the defendant "acted with at least deliberate indifference." *Darnell*, 849 F.3d at 29.

### A.  Serious Medical Need

A sufficiently serious medical need under the first prong is "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *see also Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" (quoting *Chance*, 143 F.3d at 702)).  This objective inquiry is "contextual and fact-specific" and "must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks and citation omitted).  In the context of asthma specifically, courts in this circuit have concluded that "[t]he mere fact that an inmate has an asthmatic condition does not necessarily mean that the inmate has a serious medical need," but "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore*, No. 02-CV-29F, 2005 WL 425473, at *9 (W.D.N.Y. Feb. 18, 2005); *see also Kearsey v. Williams*, No. 99-CV-8646 (DAB), 2005 WL 2125874, at *4 (S.D.N.Y. Sept. 1, 2005) ("An acute asthma attack is inarguably a condition of urgency that may cause substantial pain and that reasonable doctors or patients would find important and worthy of comment or treatment." (internal quotation marks, alterations, and citations omitted)); *Flemming v. Velardi*, No. 02-CV-4113 (AKH), 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) ("Difficulty breathing due to asthma may be a serious medical condition, depending on the severity of the asthma attack."); *Patterson v. Lilley*, No. 02-CV-6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) (distinguishing between being a person susceptible to asthma and suffering an actual attack or exhibiting symptoms of an attack).

17

"For the purposes of this motion, Defendants do not contend that Plaintiff failed to satisfy the objective prong of the deliberate indifference test." (Defs.' Mem., Dkt. 149, at 7.)  Rather, Defendants argue that summary judgment is warranted because "Plaintiff will be unable to offer any evidence proving that Dr. Kadri acted with the requisite *mens rea* when he purportedly denied medical care to Plaintiff on April 27, 2014." (*Id.*)  The Court accepts this apparent agreement that there is, at the very least, a genuine issue for trial as to whether Plaintiff had a serious medical need as a result of his asthma attack on April 27, 2014, and for present purposes, focuses on whether there is a genuine, material issue as to whether Dr. Kadri acted with at least deliberate indifference.[15]

---

[15] The Court recognizes that Defendants do not concede that Plaintiff has established the objective prong of the deliberate indifference test.  If this case goes to trial, Plaintiff must still establish that he had a sufficiently serious medical need under the first prong.  However, to the extent that Defendants argue that Plaintiff must show that he suffered substantial harm—*i.e.*, aggravation or worsening of his asthma condition—as a result of Dr. Kadri's alleged refusal to see Plaintiff a second time on April 27, 2014, and that Plaintiff will be unable to do so without expert testimony (*see* Defs.' Reply, Dkt. 150, at 8–9), this argument is misplaced.  Although adverse medical effects or resulting physical injury is certainly relevant to whether there is a serious medical need under the objective prong, "actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation."  *See Smith*, 316 F.3d at 187–88; *see also Hudson v. McMillian*, 503 U.S. 1, 7 (1992) ("The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it.").  This standard also applies to a deliberate indifference claim under the Fourteenth Amendment.  *See Darnell*, 849 F.3d at 30–31 (holding that the objective prong of a deliberate indifference claim is the same under the Eighth and Fourteenth Amendments, and noting that "serious injury is unequivocally not a necessary element of an Eighth Amendment claim" (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015))).  In any event, the record indicates that Plaintiff suffered a "near fatal exacerbation" in April 2017 (Bellevue Records, Dkt. 145-15, at ECF 327), such that doctors at Bellevue Hospital decided to prolong his stay "to help get his lung function better and make him lower risk in general population at Rikers" (*id.* at ECF 388) and even contacted the associate medical director at Rikers before Plaintiff was released back into custody with instructions that Plaintiff "have close peak flow monitoring and medication monitoring at Rikers given near fatal asthma" (*id.* at ECF 352, 388).  Additionally, as discussed below, the Court finds that there is a genuine dispute as to whether Dr. Kadri appropriately monitored Plaintiff on April 27, 2014, and discharged Plaintiff because his condition improved, as Defendants contend.  *See infra*.  Therefore, to the extent that Defendants argue that no reasonable jury could find that Plaintiff had a serious medical need on April 27, 2014 (despite

B.      **Deliberate Indifference**

The second prong of a deliberate indifference claim under the Due Process Clause of the

Fourteenth Amendment requires showing that the defendant "acted with a sufficiently culpable

state of mind"—that is, with at least "deliberate indifference." *Grimmett v. Corizon Med. Assocs.*

*of N.Y.*, No. 15-CV-7351 (JPO) (SN), 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017); *see also*

*Darnell*, 849 F.3d at 29.    Following the Second Circuit's decision in *Darnell*, deliberate

indifference under the Fourteenth Amendment is defined objectively, not subjectively.    *See*

*Gleeson v. County of Nassau*, No. 15-CV-6487 (AMD) (RL), 2019 WL 4754326, at *11 (E.D.N.Y.

Sept. 30, 2019) (collecting cases).   In other words, a pretrial detainee "need not demonstrate

subjective awareness on the part of the [defendant]." *Id.*   "[R]ather than ask whether the charged

official 'knew of and disregarded an excessive risk to inmate health or safety,' courts are to instead

determine whether the official 'knew, or should have known' that his or her conduct 'posed an

excessive risk to health or safety.'" *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 719 (S.D.N.Y.

2017) (quoting *Darnell*, 849 F.3d at 33, 35).  This does not mean that mere negligence will suffice;

a pretrial detainee "must prove that an official acted intentionally or recklessly, and not merely

negligently." *Darnell*, 849 F.3d at 36.

In the context of a claim of deliberate indifference to a serious medical need, it is well-

established that "mere medical malpractice is not tantamount to deliberate indifference." *Charles*

*v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 107

(2d Cir. 2000)).  Thus, for example, a short delay in an inmate receiving medical treatment, in

itself, does not evince deliberate indifference on the part of prison officials. *See Williams v. Cty.*

---

expressly conceding the issue in their opening brief), the Court rejects Defendants' argument at
this point and on this record.

*of N.Y. Dep't of Corr.*, No. 19-CV-9528 (ER), 2020 WL 3893929, at *6 (S.D.N.Y. July 10, 2020) (collecting cases).  Moreover, "a prisoner's disagreement with the treatment he or she received 'is not, without more, sufficient to state a constitutional claim.'"  *Id.* (quoting *Rivera v. Doe*, No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538, at *11 (S.D.N.Y. Feb. 26, 2018)).  On the other hand, where an inmate repeatedly asks for medical attention and has visible injuries, a reasonable jury could find that a defendant's delay in providing medical care rises to the level of deliberate indifference.  *See Martinez v. D'Agata*, No. 16-CV-44 (VB), 2019 WL 6895436, at *9–10 (S.D.N.Y. Dec. 18, 2019); *see also Williams v. Vincent*, 508 F.2d 541, 544–45 (2d Cir. 1974) (holding that where plaintiff needed and requested treatment, but "such requests were callously refused or ignored," plaintiff sufficiently stated a claim of deliberate indifference); *Reynolds v. O'Gorman*, No. 20-CV-686 (TJM) (ML), 2020 WL 5494396, at *4 (N.D.N.Y. Sept. 11, 2020) ("Evidence of deliberate indifference may be found in . . . a serious failure to provide needed medical attention when prison officials are fully aware of that need[.]" (citation omitted)). "Whether the [defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Charles*, 925 F.3d at 87 (citations omitted).

On the record here, the Court finds that there are genuine material disputes of fact regarding Dr. Kadri's deliberate indifference that preclude summary judgment.  Plaintiff undisputedly presented to the medical clinic at Rikers on April 27, 2014 with a known history of asthma and symptoms of a severe asthma attack, including a peak flow measurement of 150.  (*See* Defs.' 56.1, Dkt. 146, ¶¶ 14–17.)   According to Plaintiff, after Dr. Kadri administered Albuterol and Prednisone and prescribed an antibiotic, Plaintiff reported no improvement and informed an officer at the clinic, Officer Garcia, that he felt like he was "going to die."  (Pl.'s Opp., Dkt. 138, ¶ 17 at

ECF 42–43.)  Officer Garcia relayed the message to Dr. Kadri, yet Dr. Kadri refused to provide any further medical attention, leaving Plaintiff to exacerbate for hours in a "holding cell" until another doctor was available to see him.  (*Id.* at ECF 43–46; *see also* Warren Dep., Dkt. 145-7, at 99:7–16 (testifying that Dr. Kadri told Plaintiff, "I'm not seeing you again, go back to your house").)

Defendants argue that Plaintiff's account is simply self-serving and unsubstantiated by the record evidence.  (*See generally* Defs.' Mem., Dkt. 149, at 9–11; Defs.' Reply, Dkt. 150, at 5–8.) They submit an affidavit from Officer Garcia, who affirms that she does not recall any of the alleged conversations with Plaintiff on April 27, 2014, and that, based on her review of certain logbooks, she was not even at Rikers between 3:00 p.m. and 11:00 p.m. on the day in question. (Garcia Aff., Dkt. 145-16, ¶¶ 2, 4.)  Viewed in the light most favorable to Plaintiff, however, this affidavit simply indicates that Plaintiff may have identified the wrong officer, or that there is a discrepancy in the timing of events that a jury must resolve.  Indeed, there is testimony in the record that Plaintiff arrived at the clinic some time closer to noon on April 27, and Officer Garcia's affidavit states that she was in fact on duty at the "x-ray post" in the clinic at Rikers between 7:30 a.m. and 3:00 p.m.  (*See* Warren Dep., Dkt. 145-7, at 90:2–91:3; Garcia Aff., Dkt. 145-16, ¶ 4.)  Similarly, although Defendants submit evidence showing that Dr. Guillaume arrived to work at the clinic earlier in the evening than Plaintiff claims (*see* Dkt. 145-13, at ECF 2–3; Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 45), this does not necessarily undermine Plaintiff's testimony that he was refused medical attention by Dr. Kadri and left to exacerbate for hours until Dr. Guillaume was available to see him at 1:10 a.m. on April 28.

Moreover, Defendants' reliance on *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), here is misplaced.  (*See* Defs.' Mem., Dkt. 149, at 9–10; Defs.' Reply, Dkt. 150, at 6.)  In

*Jeffreys*, the plaintiff claimed that police officers assaulted him and threw him out of a third-story window while arresting him for burglary at a school.  426 F.3d at 551.  Yet, the record in that case confirmed that "on at least three occasions [plaintiff] confessed to having jumped out of the third-story window of the school building."  *Id.* at 552.  The Second Circuit affirmed the district court's grant of summary judgment, holding that the district court did not err in awarding summary judgment where it (1) "found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and (2) "even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe [plaintiff's] testimony."  *Id.* at 555 (internal quotation marks and citation omitted).  The same cannot be said here.  Although Defendants have proffered some evidence that goes to how well Plaintiff remembers the events in question and the weight that should be afforded Plaintiff's testimony, they have submitted nothing that demonstrates that Plaintiff has fundamentally contradicted himself on numerous occasions, like the plaintiff in *Jeffreys* did, such that no reasonable juror could believe Plaintiff's account.[16]  In fact, as discussed more below, the evidence

---

[16]  In their reply brief, Defendants argue that Plaintiff has a "known history of lacking credibility," pointing to Plaintiff's prior assertions in this case that he "died" on the way to Elmhurst Hospital and was "intubated" there.  (*See* Defs.' Reply, Dkt. 150, at 7, 7 n.2; *see also* Amended Complaint, Dkt. 16, ¶¶ 34–35; 11/3/17 Tr., Dkt. 39, at 14:11–15:8.)  Defendants further note that Plaintiff "finally admits" in his opposition brief that he was not intubated, but received biPAP, which is "non-invasive ventilation used for breathing support administered through a face mask or nasal mask."  (Defs.' Reply, Dkt. 150, at 7 n.2.)  The Court notes, however, that Plaintiff's Amended Complaint alleges that he was placed on a "BiLevel Respirator" at Elmhurst (Dkt. 16, ¶ 36), and Plaintiff's statement to the Court at the November 3, 2017 conference was that "[t]hey intubated me, they put me on a respirator, and they brought me back" (Dkt. 39, at 15:7–8).  Additionally, the evidence in the record does indicate that Plaintiff's condition deteriorated significantly during the trip from Rikers to Elmhurst Hospital, and the paramedics had to stop the ambulance to administer epinephrine and dexamethasone to Plaintiff.  (*See* Pl.'s Opp., Dkt. 138, at ECF 260.)  Thus, even though Plaintiff's prior assertions may not be entirely consistent or precisely accurate, the Court does not find that the credibility issues highlighted by Defendants indicate that no reasonable jury could believe Plaintiff's testimony.  *Cf. Jeffreys*, 426 F.3d at 553–

proffered by Defendants does not undermine Plaintiff's key contention that Dr. Kadri did not in fact see Plaintiff at 8:41 p.m., given the existence of other records indicating that Dr. Kadri was providing services to other patients at that time.  (*See, e.g.*, Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 43–44 (citing Clinical Visit Console record showing that Dr. Kadri saw Plaintiff only once on April 27, 2014, at 4:15 p.m., and that Dr. Kadri saw other patients at 8:27 p.m. and 8:48 p.m. that evening).)  *Jeffreys*, therefore, is inapposite.

Defendants also argue that Dr. Kadri did not act with deliberate indifference because Dr. Kadri provided Plaintiff adequate medical treatment for an asthma attack.  Defendants point out that the treatment Dr. Kadri provided Plaintiff on April 27, 2014 was the same treatment that he provided Plaintiff several weeks earlier, on March 1, 2014, when Plaintiff came to the clinic complaining of an asthma attack.  (Defs.' Mem., Dkt. 149, at 8–9; *see also* CHS Records, Dkt. 145-9, at ECF 257.)  Defendants moreover rely on Dr. O'Grady's expert opinion that "Dr. Kadri treated [Plaintiff] appropriately [on April 27, 2014] by monitoring the patient, administering a bronchodilator and Prednisone, and discharging the patient after his condition improved for reevaluation the following date.  Based upon [Plaintiff]'s improvement, there was no indication for referral on April 27th to an outside hospital."  (O'Grady Report, Dkt. 145-5, at 6; *see also* Defs.' Mem., Dkt. 149, at 7–9.)

First, the comparison between the March 1 and April 27 episodes is inapt.  There is no dispute that on March 1, after receiving two Albuterol treatments, Plaintiff "reported feeling some relief."  (CHS Records, Dkt. 145-9, at ECF 257.)  But nothing in the medical records indicates that on April 27 Plaintiff reported feeling better after receiving Albuterol and Prednisone.  (*See id.* at

---

54 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quoting *Rule*, 85 F.3d at 1011)).

ECF 324–26.)  Instead, according to Plaintiff, he reported that he felt like he was "going to die," and was ignored by Dr. Kadri.  (Pl.'s Opp., Dkt. 138, ¶ 17 at ECF 43.)

Second, the Court finds that there is a genuine, material dispute as to whether Dr. Kadri monitored Plaintiff on April 27 and appropriately discharged Plaintiff after his condition improved, as Defendants and their expert contend.  (*See* Defs.' 56.1, Dkt. 146, ¶¶ 8, 17; *see also* O'Grady Report, Dkt. 145-5, at 6.)  In rendering his expert opinion, Dr. O'Grady relied on medical records indicating that after seeing Plaintiff on the afternoon of April 27 and measuring his peak flow to be 150, Dr. Kadri documented that Plaintiff's peak flow had improved to 325 by 8:41 p.m.  (Defs.' 56.1, Dkt. 146, ¶ 17; *see also* CHS Records, Dkt. 145-9, at ECF 324.)  But the critical fact about Dr. Kadri having measured Plaintiff's flow as 325 at 8:41 p.m. is genuinely contested.  Plaintiff has submitted data from the "Clinical Visit Console," which shows that Dr. Kadri saw Plaintiff only once on April 27, 2014, at 4:15 p.m.  (*See* Pl.'s Opp., Dkt. 138, at ECF 144.)  Notably, the "Clinical Visit Console" records do not show that Dr. Kadri saw Plaintiff again at 8:41 p.m.; instead, it appears Dr. Kadri saw other patients at 8:27 p.m. and 8:48 p.m.  (*See id.*)  Furthermore, when Dr. Guillaume attended to Plaintiff at around 1:10 a.m. on April 28, just a few hours after Plaintiff's peak flow supposedly had improved to 325, Plaintiff's peak flow undisputedly measured 150, and did not improve after Albuterol was administered, which is what Plaintiff claims was the case when he saw Dr. Kadri.  (Defs.' 56.1, Dkt. 146, ¶ 20; *see also* CHS Records, Dkt. 145-9, at ECF 328.)  Defendants assert that Plaintiff's condition worsened after it improved.  (*See* O'Grady Report, Dkt. 145-5, at 6.)  But viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court concludes that a jury could reasonably find that Plaintiff was not appropriately monitored between 4:16 p.m. and 1:10 a.m. and that Dr.

Kadri refused to provide Plaintiff additional medical attention, despite being informed that Plaintiff's condition had not improved.

Accordingly, summary judgment is denied with respect to the claim of deliberate indifference against Dr. Kadri. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247–48.

## III.    Claims Against the City

Defendants argue that even if summary judgment is denied as to the claim against Dr. Kadri, the claims against the City should be dismissed on the pleadings under FRCP 12(c). A municipality is liable under Section 1983 "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978). Liability cannot be based simply on a theory of *respondeat superior*, meaning that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agent." *Monell*, 436 U.S. at 691, 694. Rather, establishing liability against a municipality under Section 1983 "requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

A municipal policy or custom, however, "may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). Thus, while municipal liability may be established by showing a violation of federal law pursuant to an express rule or policy, it may also be established where abuses are "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware"; or where a "custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses," such as evidence of a

failure to supervise or train employees properly.  *See Jones*, 691 F.3d at 81; *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126–27 (2d Cir. 2004).

At the November 3, 2017 pre-motion conference, where the Court allowed *pro se* Plaintiff to amend his pleading orally to state a proper claim of deliberate indifference against Dr. Kadri, Plaintiff expressly indicated that he was withdrawing any claim premised on a failure to train.[17] (*See* 11/3/17 Tr., Dkt. 39, at 17:2–20.)  The Court subsequently reiterated to Plaintiff at the January 17, 2020 conference that he had withdrawn his failure-to-train claim and that he could not now re-introduce a failure-to-train claim at such a late juncture.  (*See* 1/17/20 Tr., Dkt. 133, at 45:1–16.) Therefore, any claims against the City for failure to supervise or train are dismissed.

Plaintiff also fails to provide factual allegations that plausibly suggest that any constitutional violation he may have suffered with respect to the events in April 2014 resulted from an express municipal policy or a widespread custom or practice.  *See Johnson*, 569 F.3d at 44 ("To survive a Rule 12(c) motion, [Plaintiff]'s complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks and citation omitted)).  Neither Plaintiff's Amended Complaint nor the statements that Plaintiff made at the November 3, 2017 conference contain any allegations regarding a municipal policy or widespread custom or practice that led to the events of April 27, 2014.  (*See* Amended Complaint, Dkt. 16, ¶¶ 15–23, 33–42; 11/3/17 Tr., Dkt. 39, at 6–17.)  In his opposition brief, Plaintiff argues that there is a widespread custom or policy because of "other complaints and/or lawsuits asserting similar claims and/or causes of action."  (Pl.'s Opp., Dkt. 138, ¶ 18 at ECF 51; *see also id.* ¶ 20 at ECF 62, 66–67.)  *See generally Calderon v. City of New York*, 138 F. Supp. 3d 593, 611–12

---

[17]  The Court permitted Plaintiff to amend and supplement his complaint orally, in part, because the Amended Complaint that he submitted and was filed in this matter is missing paragraphs 24 through 32.  (*See* Amended Complaint, Dkt. 16, at ECF 6–7.)

(S.D.N.Y. 2015) (observing that "[p]laintiffs alleging the existence of a municipal policy or custom often point to the filing of other complaints and/or lawsuits bringing similar claims," but that courts considering such *Monell* claims "have assigned different levels of significance to the filing of prior lawsuits"). Even if prior lawsuits as a general matter are relevant to showing the existence of a widespread custom or practice, Plaintiff's allegations here provide nothing that gives rise to a plausible claim that there existed a widespread custom or practice that led to Plaintiff's alleged injuries. Indeed, all of the cases cited by Plaintiff were filed in courts outside of New York.[18] (*See* Pl.'s Opp., Dkt. 138, ¶ 18 at ECF 51, ¶ 20 at ECF 62, 66–67.) And, under the law of this Circuit, the single incident he alleges on April 27, 2014 alone is insufficient to demonstrate a custom, policy, or practice that would support municipal liability against the City. *See DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991))).

Accordingly, Defendants' motion for judgment on the pleadings as to the claims against the City is granted, and those claims are dismissed.[19]

---

[18] The cases cited by Plaintiff are: *Beagle v. Yamhill County*, No. 17-CV-711 (D. Or.); *Estate of Tabor v. Corizon Health, Inc.*, No. 16-CV-1587 (D. Colo.); *Boyd-Nicholson v. Snodgrass*, No. 15-CV-424 (D. Neb.); *LaCroix v. Brownell*, No. 18-CV-2448 (D. Minn.); *Lemond v. Talbot*, No. 17-CV-113 (S.D. Ind.); *Bossardet v. Ryan*, No. 17-CV-517 (D. Ariz.); *Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019); *Salvani v. Corizon Health, Inc.*, No. 17-CV-24567 (S.D. Fla.); *Gaines v. Jones*, No. 18-CV-1332 (M.D. Fla.); *Smart v. Allegheny County*, No. 15-CV-953 (W.D. Pa.); *Pitkin v. Corizon Health, Inc.*, 16-CV-2235 (D. Or.). (Pl.'s Opp., Dkt. 138, ¶ 18 at ECF 51, ¶ 20 at ECF 62, 66–67.)

[19] At a number of places throughout his brief, Plaintiff alleges violations of local "ministerial" policies or regulations. (*See, e.g.*, Pl.'s Opp., Dkt. 138, ¶ 3 at ECF 9–10, ¶ 17 at ECF 45, ¶ 18 at ECF 47–48, ¶ 19 at ECF 55, ¶ 20 at ECF 63.) Section 1983, however, provides a cause of action for violations of *federal* law by state actors, *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010), and in any event, the City cannot be held liable, under a theory of *respondeat superior*, "for an injury inflicted solely by its employees or agents," *see Monell*, 436 U.S. at 694. Thus, to the extent Plaintiff alleges violations of any "ministerial" policy, those claims are dismissed.

## IV.     Spoliation of Evidence

At the pre-motion conference on January 17, 2020, the Court discussed with the parties a request by Plaintiff regarding alleged spoliation of evidence.  (1/17/20 Tr., Dkt. 133, at 26:20–39:3, 48:19–49:17.)   Specifically, Plaintiff alleges spoliation with respect to 11 logbooks that Defendants failed to produce during discovery: (1) the "injury logbook"; (2) the "N/A logbook"; (3) the "emergency logbook"; (4) the "POF logbook"; (5) the "doc treatment logbook"; (6) the "consultation logbook"; (7) the "work order logbook"; (8) the "red bag logbook"; (9) the "GP previous tour logbook"; (10) the "hazard waste logbook"; and (11) the "hospital specialty clinic logbook."  (*See generally* Plaintiff's Spoliation Motion ("Spoliation Mot."), Dkt. 131.)  Defendants have provided a brief, general explanation of each of these logbooks:

> [1.] The injury log book - list of inmates who come to the clinic due to an injury;
>
> [2.] The N/A log book - New Admission logbook;
>
> [3.] The emergency log book - lists all medical emergencies;
>
> [4.] The POF - Post Order Folder explains the duties and responsibilities of various posts;
>
> [5.] The doc treatment log - lists MOS [*i.e.*, "members of service" or correction officers] receiving treatment;
>
> [6.] The consultation log - lists inmate meeting with medical staff;
>
> [7.] The work order log - work order summary for clinic (maintenance/housekeeping requests i.e. broken light fixture);
>
> [8.] The red bag log - hazardous waste;
>
> [9.] The GP previous tour logbook - notation in general logbook in which MOS acknowledged entries made by previous tour;
>
> [10.] The hazard waste log - hazardous waste; and

---

Additionally, to the extent Plaintiff attempts to allege any new claims against the City or other parties in his opposition brief, those claims are also dismissed.  "[I]t is well established that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 82 (E.D.N.Y. 2019) (alteration in original) (quoting *Skates v. Inc. Vill. of Freeport*, 265 F. Supp. 3d 222, 240 (E.D.N.Y. 2017)).

> [11.] The hospital specialty clinic logbook - DOC referred to
> hospital.

(Defendants' October 18, 2019 Letter ("Defs.' 10/18/19 Ltr."), Dkt. 123, at 3; *see also* Defs.'
Reply, Dkt. 150, at 20–21.)  Defendants have explained that a search for these logbooks was
conducted but that they "could not be located."[20]   (Defs.' 10/18/19 Ltr., Dkt. 123, at 3.)
Additionally, Defendants have produced to Plaintiff certain other logbooks—namely, the
"general" logbook from the clinic, including the logbook maintained by the "front desk clinic A
post," where Officer Garcia was normally stationed at the time of the events in question, and the
"housing" logbook.  (*See id.* at 2–3; Defs.' Reply, Dkt. 150, at 20.)  Plaintiff requests monetary
sanctions of $9,000 and an adverse inference instruction to the jury.  (Spoliation Mot., Dkt. 131,
¶ 20; *see also* Pl.'s Opp., Dkt. 138, ¶ 23 at ECF 103.)  In light of the Court's decision on summary
judgment, and based on the materials in the record and the parties' arguments at the January 17,
2020 conference, the Court finds the spoliation issue ripe for decision, and denies Plaintiff's
request in its entirety.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve
property for another's use as evidence in pending or reasonably foreseeable litigation."  *West v.
Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  FRCP 37(b)(2) allows a district
court to impose sanctions when a party spoliates evidence in violation of a court order, but even
without a discovery order, a district court may impose sanctions for spoliation under its inherent
power to manage the litigation.  *See id.* (collecting cases).

---

[20]   The issue of the logbooks was initially raised during discovery by Plaintiff's pro bono
counsel.  After Plaintiff's pro bono counsel withdrew from the case, Plaintiff renewed the issue
with the Court.  (*See* Spoliation Mot., Dkt. 131, ¶¶ 9–18; Defs.' Reply, Dkt. 150, at 20.)

As an initial matter, the Court does not find that Plaintiff has sufficiently demonstrated that the 11 logbooks at issue ever existed in the first place. Because "[t]he spoliation doctrine is predicated on evidence actually existing and being destroyed," it is "a necessary, but insufficient, condition that the sought-after evidence *actually* existed[.]" *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (emphasis in original) (internal quotation marks and citations omitted). Plaintiff asserts that the logbooks at issue are medical records or business records, but Plaintiff provides no explanation as to why that means the logbooks existed. (*See* Spoliation Mot., Dkt. 131, ¶ 19.) No reason is apparent to the Court. Plaintiff also points to a directive requiring the Department of Correction to maintain "records of activities/events that occur in housing areas within Departmental facilities." (Dkt. 131-1, at ECF 4; *see also* Spoliation Mot., Dkt. 131, ¶ 19.) But Defendants have produced housing logbooks to Plaintiff. (*See* 10/18/19 Ltr., Dkt. 123, at 3; *see also* Ex. A to 10/18/19 Ltr., Dkt. 123-1.) The Court observes that Defendants have simply represented that the 11 logbooks "could not be located," without affirmatively stating one way or the other whether the logbooks ever existed—though they have provided general descriptions of the logbooks and what information would be contained in them. (*See* Defs.' 10/18/19 Ltr., Dkt. 123, at 3; *see also* 1/17/20 Tr., Dkt. 133, at 34:4–12 (defense counsel explaining to the Court that the 11 requested logbooks "were not located, which could mean that they were never created").) All the same, the Court cannot conclude based solely on Defendants' general explanations that the specific logbooks requested by Plaintiff at some point existed. In short, there is nothing here but "speculative assertions as to the existence of documents," which "do not suffice to sustain a motion for spoliation of evidence." *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007).

Even assuming the logbooks that Plaintiff requests existed at some point and were lost or destroyed, Plaintiff has not demonstrated that he is entitled to sanctions against Defendants.  To succeed on a spoliation motion based on the destruction of evidence, the moving party must establish three elements: (1) "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) "that the records were destroyed 'with a culpable state of mind'"; and (3) "that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (citation omitted); *see also Charles v. City of New York*, No. 12-CV-6180 (SLT) (SMG), 2017 WL 530460, at *26 (E.D.N.Y. Feb. 8, 2017) (quoting *Residential Funding*, 306 F.3d at 107).  The parties, and particularly Defendants, focus on the last element of relevance.  (*See* Defs.' 10/18/19 Ltr., Dkt. 123, at 2–3; Defs.' Reply, Dkt. 150, at 20–22; *see also* 1/17/20 Tr., Dkt. 133, at 49:3–10 (affirming that Defendants' position is that none of the requested logbooks are relevant).)

Relevance in this context "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding*, 306 F.3d at 108–09.  In particular, it requires the moving party to "adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Id.* at 109 (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998)).  At the same time, courts must be careful not to hold the movant to "too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence." *Id.* (quoting *Kronisch*, 150 F.3d at 128).  And "[i]f a court finds bad faith or gross negligence, the bad faith (always) and the gross negligence (usually) can support a finding that the destroyed or lost evidence was relevant to the claims of the party seeking it." *Klezmer ex rel.*

31

*Desyatnik v. Buynak*, 227 F.R.D. 43, 50 (E.D.N.Y. 2005) (citing *Residential Funding*, 306 F.3d at 109).

Here, nothing supports a finding that Defendants lost or destroyed the requested logbooks in bad faith or with gross negligence.  Plaintiff dwells on what he calls "ministerial" policies— seemingly suggesting that they required Defendants to have preserved the logbooks at issue—but these polices relate to the preservation of medical records and housing logbooks.  (*See* Spoliation Mot., Dkt. 131, ¶¶ 39–42; CHS Medical Records Policy, Dkt. 131-1, at ECF 2; Housing Logbooks Directive, Dkt. 131-1, at ECF 6; *see also* 1/17/20 Tr., Dkt. 133, at 31:15–25.)  There is no reason to believe that the logbooks at issue are medical records,[21] and as for the housing logbooks, Defendants have preserved and produced them to Plaintiff.  (*See* Defs.' 10/18/19 Ltr., Dkt. 123, at 3; 1/17/20 Tr., Dkt. 133, at 33:25–34:12.)  Indeed, the Court finds no reason to doubt defense counsel's representation that Defendants "did an investigation" for all of the logbooks that Plaintiff demanded and turned over all of the ones they could find, including the general logbook from the clinic and the housing logbook.  (*See* 1/17/20 Tr., Dkt. 133, at 33:25–34:12.)  Therefore, Defendants' inability to locate the 11 logbooks presently at issue demonstrates, at most, negligence, and Plaintiff must adduce some evidence from which it could reasonably be inferred that the logbooks will be favorable to him.  *See Residential Funding*, 306 F.3d at 109; *see also Charles*, 2017 WL 530460, at *27.

Plaintiff has not done so.  He argues that the missing logbooks will show that Officer Garcia was, in fact, in the clinic between 3:00 p.m. and 11:00 p.m. on April 27, 2014, but he provides not

---

[21]  Indeed, if the logbooks are medical records as Plaintiff claims, Plaintiff has not demonstrated that he is entitled to those records, per the "policy of strict confidentiality" that Plaintiff himself cites and attaches to his motion. (CHS Medical Records Policy, Dkt. 131-1, at ECF 2; *see also* Spoliation Mot., Dkt. 131, ¶ 19.)

a scintilla of evidence that supports such a contention.  (*See* Spoliation Mot., Dkt. 131, ¶¶ 46–63; *see also* 1/17/20 Tr., Dkt. 133, at 28:3–4 ("The only reason why the notebooks are relevant is to show that [Officer] Garcia was there at that time.").)  Indeed, the general logbook from the clinic that Defendants have produced, which includes the log maintained by the "front desk clinic A post" where Officer Garcia was normally stationed, indicates that Officer Garcia was not on duty at the clinic between 3:00 p.m. and 11:00 p.m.  (*See* Garcia Aff., Dkt. 145-16, at ECF 8–9.) Plaintiff provides nothing but speculation that the missing logbooks will mention Officer Garcia, much less include information contrary to the general logbook that will help his case.  Accordingly, Plaintiff has not demonstrated spoliation of evidence, and his request for monetary sanctions and an adverse inference jury instruction is denied.  *See Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) ("[B]ecause plaintiff's argument that there has been any actual loss of evidence relevant to the claims or defenses in this case amounts to pure speculation, it is insufficient to sustain a motion for spoliation sanctions.").

## CONCLUSION

For the reasons above, summary judgment is denied as to the claim of deliberate indifference against Dr. Kadri, judgment on the pleadings is granted as to the claims against the City, and Plaintiff's request for spoliation sanctions is denied.  This case shall proceed on only the claim of deliberate indifference against Dr. Kadri, and all other defendants except for Dr. Kadri are terminated as parties to the case.  Within sixty (60) days of the date of this Memorandum and Order, Plaintiff and Defendant Kadri shall separately prepare and file their respective portions of a joint pre-trial order that complies with the Court's Individual Rules.[22]  Thereafter, each party will

---

[22]  Given Plaintiff's *pro se* status, along with a copy of this decision, the Court will mail Plaintiff the portion of the Court's Individual Rules specifying the elements of the joint pre-trial order that Plaintiff must prepare and submit.

have thirty (30) days to submit objections to the opposing party's witnesses and exhibits and to identify any additional proposed motions *in limine* based on the opposing party's portion of the joint pre-trial order.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal of this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*            
Pamela K. Chen
United States District Judge

Dated: March 26, 2021
      Brooklyn, New York